Ladies and gentlemen, our first case for this morning is United States v. Adkinson, and I believe Ms. Schmucker is up. And we appreciate the efforts of everyone in the courtroom to be here today. Thank you. It was a long day yesterday. May it please the Court, this case brings up two things. One is a change of venue, and the other is cell phone historical location data. With the venue, the government has argued that this is not preserved, at least not as to a change of district. I would beg to differ on that point. During the discussion about the change of venue, the district court itself specifically discussed moving the case to the Northern District and the Terre Haute Division, where there was a larger minority population, which was what the defense counsel was looking for. And so I don't think at that point that the government or the court understood the motion that was made to change the venue to be limited just to a change of division. But how far does that principle take us? I mean, certainly there are districts in the United States with significantly larger minority populations, but we do have the constitutional venue rules. We need to locate a prosecution where the crime took place. There's nothing wrong, per se, with the Southern District of Indiana's plan. No, there wasn't, and of course that was discussed as well. However, the concern here is the implicit racial bias, and the cases that we have historically on this really don't touch upon that. Batson doesn't touch upon it, and neither do the other cases from this circuit really. You seem to be arguing that because the veneer was composed largely of individuals of a different race, almost that there should be a presumption of implicit bias. Are there any cases that support that? There are. I didn't find any specific cases that talked about it.  I think I cited a couple in my brief. And let me back up. Yes, there was one that talked about implicit bias. It was out of the circuit, which was cited in my brief. But not about a presumption. Certainly there are implicit bias issues that come up during jury selection and during WADIR. That's what WADIR is all about, to try to ferret those out. But your argument that there should be a presumption given the racial composition of the veneer, I haven't found anything that would support that. Well, I think saying a presumption is perhaps taking it a step too far, a step beyond where I'm trying to get the court to go. Then where are you trying to go? If not a presumption, you're asking for a change in venue based on what the composition of the veneer looks like, because the composition was largely white. That alone seemed to be the basis, based on my review of the transcript, for your argument that it should be moved. There doesn't seem to be, and you haven't argued, that any questioning of individual members brought on implicit bias. So if it's not a presumption, what would it be? Right. Well, the Nettles case, which was decided in 2007, so more than 20 years ago, basically is the one that talked about the implicit bias. It said that the discussion of voir dire would not solve that problem. So it was an acknowledged issue even then. But you know, it does occur to me that, first of all, there's been a lot of social science research done on implicit bias over more recent times, and it's something that we've become more aware of. But on the other hand, traditionally with jury selection in voir dire, as long as the judge squarely asks the juror, do you regard yourself as capable of giving a verdict based on the evidence in accordance with the laws I give it to you, and if the juror says yes, then they're on. So whatever is harbored in their head. And the problem with the implicit bias research is that it pretty much shows that every single one of us has implicit bias. And so I don't know what we do with that fact. Well, at that point, I think then, you know, the standard under the Federal Rules of Criminal Procedure for granting the change of venue upon the request really is met if we're acknowledging that there's this great potential for implicit bias and we have such a large majority of the jury. The majority of the veneer is, you know, not a minority, and we have a minority defendant. You know, the standard for granting a change of venue is fairly low. But how many people of the defendant's own demographic characteristics do we need on a jury before we can feel satisfied that this has been addressed? Well, I think that needs to be left to the defense counsel in the particular case to be satisfied that there's enough people in the veneer that they feel like not just that they've got a fair cross-section, but as defense counsel argued before the district court, that there's people there that are going to be able to relate to the defendant. Wouldn't that squarely conflict with this court's cases that say that in Supreme Court cases that say that a defendant is not entitled to a jury in whole or in part of the defendant's own race? No, I don't think so. How can you make those two principles consistent with each other? If you're saying, if you walk in and the veneer is composed primarily of a different race than the defendant, that alone shows implicit bias which would meet the standard for a change of venue, and it's purely based on the race, isn't that the same as saying, well, because you're not getting a jury of the same race, or largely the same race, that there's prejudice? Well, first of all, most of those cases have occurred prior to this more recent research we have on implicit bias. And so I don't think very many of them, except for perhaps the Nettles case, which was 22 years ago, really sort of even touched upon those arguments at all. And so that becomes something new that we have to deal with now that we know better. We need to do better in terms of potential bias in our jurors. And so if the defense counsel is specifically concerned and raises that concern and says, look, I don't think my client's going to be able to get a fair trial here, there's nobody that can relate to him, then I think we have to defer to that and let there be move to someplace else that was suggested. I mean, he suggested Indianapolis. Granted, it's not a significantly larger minority population there than in... Isn't it like 4% versus 1%? Right, so it's New Albany. But again, as I said, they also discussed moving it to Terre Haute, which is a substantially larger minority population, so at least he has a better chance of getting, you know, a percentage of people on the jury who would have some sway. But why wouldn't Flautier be enough to determine this implicit bias? Especially, as Judge Wood noted, we have all this research out there about implicit bias now to help in framing questions, to know what to ask, to try to get at someone's implicit bias. Well, because the research itself, as well as Nettles, acknowledges that the voir dire isn't enough. It doesn't get you there. What research tells that? I haven't seen any research saying that Flautier won't do that. Well, there was the research that I cited in the brief that talks about the fact that its implicit bias is sort of so buried that even when you talk about it, we don't really acknowledge it. We may not even know it's there ourselves. So how can you answer voir dire questions that give knowledge of that to the defense counsel when you're not even sort of acknowledging it yourself? But wouldn't that be defense counsel's job to figure out what the question should be to ask? Like any other issue that you might be concerned about. It is, and I'm running out of time, so I just want to quickly say yes. But again, the Nettles court in this circuit said over 20 years ago that's not enough. I want to jump quickly to the issue of just the witnesses and point out that of the 31 witnesses, only 4 of them were from Indiana, so it's really not a matter of convenience. 12 of them were from Illinois, 5 from Iowa, 4 were brought from prison, 2 from Missouri, 2 from the FBI, presumably one local, at least one or two, one from Quantico, and the others from Kentucky, New Jersey, and Ohio, one each. Also, the ones who had to fly in for the third day of trial, if the motion had been granted on the first day of trial, they could have just rescheduled. And I'm also concerned really sort of, and I think the court should be very concerned about the appearance of impropriety, about choosing New Albany over any of the other available courts that this multi-state case could be tried in. And I have very little time left. I think I need to reserve my time. All right. Thank you. That's fine. Thank you very much. Ms. Domasch? May it please the court, Pamela Domasch for the United States. Before addressing the merits, I'd like to make a correction to one of the statements made by opposing counsel as to Terre Haute. Terre Haute is not more diverse than the other divisions in the Southern District of Indiana. It's comprised of mostly rural counties, and the Terre Haute division is in the Southern District of Indiana, not in the Northern District of Indiana. But this case was also tried in the Southern District. It was. So that would be another potential place within the same district. Correct. Okay. So why was it tried in New Albany? Why did the government choose that division? Was there one of the robberies? Yes, Your Honor. The government chose New Albany because the Clarksville, Indiana robbery, which is where this investigation really began, occurred in the Southern District of Indiana. And that T-Mobile victim, when investigating the robbery, then contacted the New Albany FBI office. So the New Albany FBI office, which is in the Southern District of Indiana, began this investigation and worked with the Southern District of Indiana United States Attorney's Office. And those two agencies worked together during the course of this investigation. Was that the first FBI office to be contacted about this? Yes. Right. So the argument that Ms. Schmucker is making is that, I guess there's some minimum number of people who need to be in a veneer. I don't even know why. That wouldn't also be on a jury, but at least on a veneer. And you just had the one individual who was in this one. Yes, there was only one African American in the veneer. And he did wind up on the jury? She, and, yes, she was selected for the jury. Yes. So however that happened, that was okay. I mean, the research is quite interesting. I don't know if you've ever tried any of those online tests, but when you do these tests, I suppose perhaps the jury could be, or the veneer could be asked to do that. You discover that you're making assumptions about people with your quick thinking, so to speak, that you wouldn't want to make necessarily with your more considered reaction. Was there any exploration of racial bias during the voir dire in this case? Your Honor, I can't offhand recall the questions asked by each defense counsel, but both defendants during this trial were African American, and whether or not their attorneys strategically chose to discuss issues of bias or not I think is something that attorneys frequently do. And that's a strategic choice, whether or not you want to confront that directly or whether you want to use a more subtle approach to determine if there are members of the jury panel that were biased. But certainly nothing occurred during the voir dire that led any motion to be made suggesting that the panel itself had any explicit bias. Were there any individual jurors left on the jury who defense counsel had challenged as biased? I do not believe so, Your Honor. I mean, the difficult thing about this theory is that it would actually not only call into question a great number of juries that are selected, but I don't see why it wouldn't equally apply to a trial to the court. Judges may be walking around with implicit bias, too, and indeed so we've been told. So it's a – if we did think there was a problem, is there room for harmless error review here? Yes, Your Honor. Even if a problem had occurred, I think that there's no suggestion that it shouldn't be harmless error. There's an overwhelming amount of evidence against this defendant, and any reasonable jury would have convicted this defendant based on the evidence presented at trial. So given that, even if there was some problem early on, I don't believe that it would overcome the harmless error. How many counties does New Albany bring in for jurors? I believe it's perhaps 14. And the statistics we're looking at is for all 14? Yes. So the other thing I'm thinking of is the line of Supreme Court cases about error in failing to sustain a challenge for cause, and then the person sometimes will use a peremptory challenge in the court. I think it's the Greenwood case. The court has said actually that's what peremptories are for. The only question after the fact is whether the jury that actually sat was a fair jury, which might have some application to this argument. And I don't believe that, to the best of my recollection from the trial and reviewing the transcripts, that the defense counsel made any challenges for cause that were overruled, and that person later sat on the jury. Right. Okay. And we also had a cell phone issue here about the use of information that T-Mobile had collected before it got turned over to the government. I don't know if you wanted to comment on that. Your Honor, we think that this cell site data, this data issue is fairly straightforward on the merits. Carpenter would not have applied to the issues in this case, and even if it would, good faith would apply here. The Carpenter decision was not decided until after this case was tried, and we would just ask that this court affirm. Because there's no compulsion. Is that the distinction you're seeing to Carpenter? T-Mobile was doing this as part of its own internal investigation? I think that's one of the distinctions. Carpenter also explicitly does not apply to tower dumps, which is what the T-Mobile was obtaining in this case and then providing later to the government. That's only part of it, though, right? They obtained tower dumps, but they also obtained some historical cell information that Carpenter would apply to. Historical cell site information was later obtained by the government with a 2703 order. Under the SCA, right? Yes. Was any of that historical cell site information obtained directly from T-Mobile? Not the tower dump, but the other category of cell site information? I do not believe so, Your Honor. The court more carved out tower dumps than ruled on it one way or the other. It didn't give it the green light. They just said that's not what we're doing here. That's correct, Your Honor. I think in that distinguishing factor, Carpenter doesn't apply to tower dumps, and there may be a situation somewhere down the line where, obviously, the courts are going to have to address that issue. But given the facts of this case and the overwhelming amount of evidence against this defendant, the case here today I don't think is the case for that. Yeah, I mean, the court is showing some real difference. Between Riley and Carpenter and others, I think the court's very aware that cell phones are just in their own category of things that might be searched or information might be collected about them. So I think it would be prudent for the government to move carefully in this area. Absolutely, Your Honor. I'm sure it's a lot of fun to come to Chicago in the middle of a sleep storm, especially when the government's shut down. Yes, it keeps life interesting. Yes. But anyway, warrants would solve some of that problem because people would be filing an Anders brief, as some of the other co-defendants did. Absolutely, and certainly there are times where an abundance of caution, even if it's not required, the government does decide to obtain a warrant just to prevent any potential issues, even if it's not required by law. Understood. I see no further questions. Thank you. And we simply ask this court to affirm. Thank you. All right. And Ms. Schmucker, we'll give you a full minute. I know you were into the seconds. Thank you, Your Honor, for the extra time. I want to respond to the tower dump and the historical CSLI information. First of all, Carpenter, you're right, does make a carve-out for the tower dumps. But it also says that seven days of historical CSLI is subject to Fourth Amendment protections. Getting that is a search. Here, the record says that they got eight days of tower dumps from T-Mobile in order to track Mr. Atkinson's location on the days of the various offenses. And if you want to see where that is, it's in the district court docket 320. It's the second exhibit. It's in the affidavit for the search warrant. That was September 11th. Also, the DOJ policy was issued the same day that the SCA order was sought. It should have known better, especially since it wasn't served until five days later. They had time to fix that. My time is just about up. Are you agreeing that the historical cell site information came pursuant to the 2703 order and not directly from T-Mobile with the tower dump information? My understanding is that the initial information was tower dump. It was provided by T-Mobile. There was an argument about whether or not they were an agent. I would still submit that T-Mobile was acting as an agent. There are a couple things in the record that certainly suggest that. Schroeder, who's the T-Mobile guy, he says, I'm here to follow up on investigations. I'm here to work with law enforcement. And they gave the information so that the FBI could request data from them. So they said, oh, it's available. We want to request it from them. At one point, FBI agent Hornback was asked, did you request this information? And he actually says, yeah, I requested information from T-Mobile. And this is before even the order was issued. So they are working together. Also, there's the issue of the Crime Dex, which is set up. If you go to the Crime Dex website, it says it's set up so that they can collaborate, so that they can work together. With police. So I think saying that T-Mobile, in giving this information, is not acting as an agent is a bit of a stretch. And just I want to point out, I know that Judge Wood and Judge Kahn, both of you were on the Curtis case recently. And this sort of had the same issue. And the good faith exception was applied in that case. I get it. I think it was appropriate. Here, however, as I pointed out, the subpoena was issued, or the order was issued under the Act for the date of the same day. The DOJ is saying you can't get this stuff without a search warrant. We agree. At probable cost. All right. Well, thank you very much. We appreciate your acceptance of the appointment. We appreciate your efforts to get here. We equally appreciate the efforts of the government to get here in these fraught times. And so, with all of that, we will take the case under advisement. Thank you.